**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| MELANIE Z.,[1]                ) | |
|                  ) | |
|     *Plaintiff,*     ) | |
|                  ) | |
|         v.         ) | Civil No. 3:23-cv-00425-RCY-SLS |
|                  ) | |
| MARTIN O'MALLEY,    ) | |
| Commissioner of the     ) | |
| Social Security Administration,[2] ) | |
|                  ) | |
|     *Defendant.*    ) | |
|                  ) | |

## REPORT AND RECOMMENDATION

In this action, Plaintiff Melanie Z. seeks review of the Commissioner of the Social Security Administration's ("SSA") decision to deny her Title II application for disability insurance benefits. This matter comes before the Court for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment. (ECF Nos. 9, 11.) The motions have been fully briefed (ECF Nos. 9, 10, 11, 13), rendering this matter ripe for review.

Plaintiff requests that the Court order the Commissioner to award Plaintiff benefits or, in the alternative, remand this matter for further evaluation. (Plaintiff's Memorandum in Support of Motion for Summary Judgment (ECF No. 10) ("Pl.'s Mem.") at 24.) As the basis for such relief, Plaintiff argues that the Administrative Law Judge ("ALJ") erred in assigning limited weight to

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that federal courts refer to claimants by their first names and last initials in social security cases.

[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, he has been substituted for Acting Commissioner Kilolo Kijakazi as Defendant in this action. No further action need be taken. 42 U.S.C. § 405(g).

Dr. Anne Creekmore's opinions and erred in evaluating Plaintiff's subjective complaints.  (Pl.'s Mem. at 9, 12-24.)  The Commissioner responds that the ALJ properly considered and analyzed both Dr. Creekmore's opinions and Plaintiff's subjective complaints and that the final decision should be affirmed.  (Defendant's Motion for Summary Judgment and Brief in Support Thereof (ECF No. 11) ("Def.'s Mem.") at 12-20.)

The Court agrees with Plaintiff that the ALJ failed to apply correct legal standards in evaluating Dr. Creekmore's opinions and failed to sufficiently consider or explain the record evidence in extending limited weight to those opinions.  The ALJ also erred by improperly disregarding Plaintiff's subjective statements.  For these reasons and those that follow, the Court RECOMMENDS that: (1) Plaintiff's Motion for Summary Judgment (ECF No. 9) be GRANTED; (2) the Commissioner's Motion for Summary Judgment (ECF No. 11) be DENIED; (3) the final decision of the Commissioner be REVERSED; (4) the case be REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Report and Recommendation; and (5) final judgment be entered under Rule 58 of the Federal Rules of Civil Procedure.

## I.      PROCEDURAL HISTORY

Plaintiff filed an application for disability benefits on September 30, 2014, alleging disability beginning October 31, 2013.  (Administrative Record ("R.") at 159-169.)[3]  Her claim was denied initially and upon reconsideration, and an ALJ in California found her not disabled on

---

[3] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers from this Report and Recommendation. The Court will further restrict its discussion of Plaintiff's medical information to the extent necessary to result in a proper analysis of the case.

May 10, 2017.  (R. at 139, 155, 159-69.)  On May 9, 2018, the SSA Appeals Council remanded the case for a new hearing.  (R. at 176-79.)

On April 9, 2019, a hearing was held before an ALJ in Virginia, where Plaintiff had relocated.  (R. at 43-88.)  On July 2, 2019, the ALJ issued an unfavorable decision.  (R. at 15-31.)  On June 16, 2020, the SSA Appeals Council denied Plaintiff's request for review.  (R. at 1-6.)  On August 13, 2020, Plaintiff filed an appeal in this Court.  *Melanie Z. v. Kijakazi*, No. 3:20-cv-627-HEH (E.D. Va. filed Aug. 13, 2020).  On July 21, 2021, the Court remanded the case pursuant to the Commissioner's Consent Motion to Remand.  Order, *Melanie Z. v. Kijakazi*, No. 3:20-cv-627-HEH (E.D. Va. filed July 21, 2021).

On March 28, 2022, the SSA Appeals Council vacated the previous decision and remanded the case for a new hearing.  (R. at 6477-80.)  The Order of the Appeals Council identified the following issues, among others, in the prior decision: (1) "The hearing decision does not contain an adequate evaluation of the opinion from [Plaintiff's] clinical psychologist, Anne Creekmore;" and (2) "The decision does not fully evaluate [Plaintiff's] symptoms."  (R. at 6477-78.)  On July 19, 2022, the ALJ held a hearing on remand.  (R. at 6409-40.)  On August 19, 2022, the ALJ issued a written decision, finding Plaintiff not disabled under the Social Security Act ("the Act").  (R. at 6382-98.)  On May 3, 2023, the SSA Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (R. at 6371-75.)  Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual has a disability "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." *Id.* § 423(d)(2)(A).

SSA regulations set forth a five-step process to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); *see Mascio v. Colvin*, 780 F.3d 632, 634-35 (4th Cir. 2015) (describing the ALJ's five-step sequential evaluation). At step one, the ALJ must review the claimant's current work activity to determine if he or she has been participating in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). At step two, the ALJ must ask whether the claimant's medical impairments meet the regulations' severity and duration requirements. *Id.* § 404.1520(a)(4)(ii). At step three, the ALJ must determine whether the medical impairment(s) meet or equal an impairment listed in the regulations. *Id.* § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"), which accounts for the most that the claimant can do despite his or her impairments. *Id.* § 404.1545(a).

At step four, the ALJ must assess whether the claimant can perform his or her past employment given his or her RFC. *Id.* § 404.1520(a)(4)(iv). The burden of proof remains with the claimant through step four of the analysis, and the claimant must prove that his or her limitations preclude the claimant from performing his or her past relevant work. *See Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). If such past work can be performed, then benefits will not be awarded, and the analysis ends. *See* 20 C.F.R. § 404.1520(e). However, if the claimant cannot perform his or her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant

can perform other work that is available in the national economy. *See id.* § 404.1520(a)(4)(v). The Commissioner usually offers this evidence through the testimony of a vocational expert. *See Mascio*, 780 F.3d at 635.

In reviewing the Commissioner's decision to deny benefits, a court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio*, 780 F.3d at 634 (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *See Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). The substantial evidence standard "presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts." *Dunn v. Colvin*, 607 F. App'x 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). Thus, a decision by the Commissioner is not subject to reversal merely because substantial evidence would have supported a different conclusion. *Id.*

To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)); *see Craig*, 76 F.3d at 589. The Court must consider the support for the Commissioner's decision and "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). If a fact is supported by substantial evidence, the reviewing court must affirm, regardless of whether the court agrees with such findings. *Hancock*, 667 F.3d

at 476 (citing *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996)).  If the Commissioner's findings are arbitrary or unjustified, then they are not supported by substantial evidence, and the reviewing court must reverse the decision.  *See Breeden*, 493 F.2d at 1007.

### III.   THE ALJ'S DECISION

The ALJ analyzed Plaintiff's disability claim using the five-step evaluation process.  (R. at 6382-98.)  *See* 20 C.F.R. § 404.1520(a)(4); *Mascio*, 780 F.3d at 634.  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity from October 31, 2013 (the alleged onset date) through September 30, 2019 (the date last insured) but had engaged in substantial gainful activity after December 2021.  (R. at 6385.)  At step two, the ALJ found that Plaintiff's severe impairments through September 30, 2019 included somatization disorder, major depressive disorder ("MDD"), general anxiety disorder, and post-traumatic stress disorder ("PTSD").  (R. at 6385-86.)[4]  At step three, the ALJ determined that through September 30, 2019, Plaintiff did not have an impairment, individually or in combination, which met or equaled a disability listing in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 6386-88.)

The ALJ then determined Plaintiff's RFC after considering "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p."  (R. at 6388.)  Based on the evidence in the record, the ALJ found that through September 30, 2019, Plaintiff retained the ability to perform light work as defined in 20 C.F.R. § 404.1567(b) with the following limitations:

---

[4] The ALJ also found that Plaintiff suffered from severe physical impairments.  (R. at 6385-86.) Plaintiff "does not question [those] finding[s] or how the ALJ translated those conditions into work-related limitations."  (Pl.'s Mem. at 3 n.2.)  Because Plaintiff's assignments of error center on the ALJ's evaluation of her mental impairments, the Court likewise limits its discussion where appropriate to those impairments.

> [Plaintiff] is able to occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl.  She can frequently handle and finger bilaterally, and she can never climb ladders, ropes, or scaffolds.  [Plaintiff] is able to concentrate, persist, and maintain pace to complete tasks that do not require stringent quotas or fast pace for two hours at one time with normal breaks.  She is able to adapt to occasional workplace changes[.]

(R. at 6388.)

The ALJ noted that, at the time of the hearing, Plaintiff worked as a customer service supervisor for a library.  (R. at 6389.)  During the period at issue, Plaintiff worked part-time on occasion.  (R. at 6389.)  But Plaintiff stated she could not engage in substantial gainful activity because of ongoing hand pain, mental impairment symptoms, and resulting restrictions in day-to-day functioning.  (R. at 6389.)  Plaintiff testified to an inability to care for her children and experiencing anxiety attacks, suicidal ideations, emotional outbursts, and difficulty with social interaction.  (R. at 6389.)  At the 2022 hearing, she stated that treatment and hypnotherapy with Dr. Creekmore helped her regulate her symptoms, stay grounded, and "get her life back on track."  (R. at 6389.)  Plaintiff stopped using anti-depressants in 2021.  (R. at 6389-90.)

A 2014 Function Report indicated that Plaintiff could care for her two children while her husband worked and had the "capacity to care for some personal hygiene needs, prepare simple meals, put toys away, assist with laundry, drive, shop for personal items, handle her finances, read, watch movies, attend support groups, and maintain medical appointments."  (R. at 6390.)  Reports submitted in 2018 and 2019 stated that Plaintiff's husband handled most household chores and any activity requiring use of hands.  (R. at 6390.)  Plaintiff was responsible for getting her son on the bus in the morning and homeschooling her daughter.  (R. at 6390.)  Homeschooling involved printed worksheets, videos, and attending social classes one to three times per week, but Plaintiff felt like she was failing her daughter at homeschooling.  (R. at 6390.)  Plaintiff also reported having good days and bad days.  (R. at 6390.)  On good days, she could go to the park, to a museum, or

grocery shopping.  (R. at 6390.)  On bad days, she reported a reduced functional capacity, and she would stay in bed or take long showers.  (R. at 6390.)  Plaintiff testified to having two to three days a week over a period of several years where she would not get out of bed.  (R. at 6390.)

The ALJ summarized Plaintiff's medical records and treatment beginning in 2013.  (R. at 6390-96.)   Mental status examinations in late 2014 noted Plaintiff's depressed mood and constricted affect.  (R. at 6391.)  But her thought processes remained coherent, relevant, and logical, and such examinations did not report perceptional disturbances, suicidal ideation, homicidal ideation, or acute thought content irregularities.  (R. at 6391.)  The ALJ found a "marked discrepancy" between Plaintiff's reported depression, anxiety, frequent fatigue, and difficulty focusing with the findings of an evaluation on December 18, 2014, which noted no evidence of cognitive or concentration limitations and no sustained affect disturbance.  (R. at 6391.)  Later mental status examinations noted depressed mood and affect over time, but coherent, logical, and relevant thought processes.  (R. at 6391.)

Plaintiff "endorsed increasing depression complicated by [her] familial financial stressors," which resulted in a medication adjustment and a referral to counseling and therapy.  (R. at 6392.)  In late 2017, Plaintiff reported recurrent depression and anxiety, and she was diagnosed with somatic symptom disorder.  (R. at 6392.)  Her memory, insight, judgment, motor skills, thought processes, and thought content remained grossly normal.  (R. at 6392-93.)  Her symptoms were exacerbated when both her and her husband lost their jobs and she stopped medications due to an insurance denial.  (R. at 6393.)  Her medication was adjusted, and she began outpatient care with Dr. Creekmore.  (R. at 6393.)

The ALJ concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were "not supported by the conservative and grossly outpatient

treatment history during the period at issue, the clinical and examination findings of no acute

complications, and [Plaintiff's] stated ongoing capabilities." (R. at 6394.) The ALJ explained:

> [T]he record reflects mental health treatment that was entirely conservative, routine, and performed on an outpatient basis. There is no evidence of a psychiatric hospitalization of any kind that result[ed in] a loss of adaptive functioning for a period of extended duration. The mental health treatment documented throughout the record was entirely outpatient with therapy and medical management of her symptoms. There was no evidence at any point of any kind of psychiatric complication or acute thought content irregularities, as memory, concentration, and focus remained grossly normal at follow-up evaluations. There is no objective support for the testified recurrence of symptom flares that have left her bedridden 2-3 days per week. Furthermore, as noted above, in 2014 statements, [Plaintiff] and her spouse described how [Plaintiff] cared for their two children while he worked Monday through Friday. (Exhibit 3E, page 2.) They reported a capacity to care for some personal hygiene needs, prepare simple meals, put toys away, assist with laundry, drive, shop for personal items, handle her finances, read, watch movies, attend support groups, and maintain medical appointments (Exhibits 3E and 5E). Even when accounting for reported increases in symptoms and fluctuations, she retained some capacity to provide a home school environment for her oldest daughter and work on at least a part time basis during the period at issue. The undersigned notes that while she returned to full time work activity in 2021, there is no documented evidence to support she could not have returned to this employment at an earlier date.

(R. at 6393-94.)

The ALJ then considered opinion evidence under 20 C.F.R. § 404.1527. (R. at 6394-96.)

The ALJ stated that "[t]he opinion of a treating physician or psychologist concerning the nature

and severity of an impairment is entitled to appropriate consideration, that is, if it is well-supported

and not internally inconsistent or inconsistent with other pertinent clinical evidence." (R. at 6394.)

This appeal challenges the ALJ's evaluation of Dr. Creekmore's opinion.

In a 2018 assessment, Dr. Creekmore found that Plaintiff met the disability criteria for

panic disorder, MDD, PTSD, and dissociative identity disorder ("DID"). (R. at 6395.) She opined

that Plaintiff could not function independently aside from brief daily periods, could tolerate only

minimal activities with family members, and could not work in any capacity. (R. at 6395.) In

2019, Dr. Creekmore provided a more detailed statement describing Plaintiff's conditions and treatment, reporting that Plaintiff slept 15 hours a day, had no homemaker responsibilities, went weeks without engaging in homeschooling activities, and could only engage in activities for a period of one hour at a time. (R. at 6395-96.)  Dr. Creekmore further found no evidence of lying or exaggeration.  (R. at 6395.)  In a 2022 statement, Dr. Creekmore reported that Plaintiff's symptoms increased when she attempted to return to work and that Plaintiff had stopped treatment with her in April 2020.  (R. at 6396.)

The ALJ assigned limited weight to Dr. Creekmore's opinion, explaining:

While accounting for the treating nature of the relationship that lasted for approximately three  years, the undersigned gives the findings of [Dr.] Creekmore limited weight.  The conclusions drawn regarding the nature and severity of the claimant's functional limitations are just not reflected at any point by any other treating provider in the nearly 10 years and 6000 pages of records available.  The mental status evaluations by treating medical providers otherwise note normal memory, focus, concentration, and there are no clinical signs of a psychotic process or acute thought content irregularities.  The treatment for her mental health conditions was otherwise entirely conservative, routine, and outpatient, as there was no evidence of a psychiatric hospitalization or a symptom exacerbation consistent with the clinical presentation described by [Dr.] Creekmore above.  The functional limitations described similarly are not consistent with the longitudinal record.  Even when accounting for pain fluctuations and reported symptom exacerbations, she retained at least some capacity to care for personal needs, prepare simple meals, assist with household chores, drive, shop for personal items, manage the household finances, home school a seven year old child, and work on a least a part-time basis in 2016-2017, 2019, 2020, and 2021.  Finally, the conclusions regarding employment are of little relevance to the assessment, as employability remains an issue reserved for the Social Security Commissioner.  Nevertheless, in contrast to [Dr.] Creekmore's assessment that [Plaintiff] would not survive if she returned to full time employment, the undersigned notes that she did in late 2021 and continues to do so to this date.  As a result, the conclusions of [Dr.] Creekmore are given limited weight.

(R. at 6396.)

After completing the RFC assessment, the ALJ determined at step four that Plaintiff could not perform any past relevant work during the period at issue.  (R. at 6396-97.)  At step five, the

ALJ concluded that Plaintiff could perform jobs that existed in significant numbers in the national economy considering her vocational factors.   (R. at 6397-98.)   Based on vocational expert testimony, the ALJ found that Plaintiff could perform the jobs of marker, router, and order caller. (R. at 6397-98.)  Thus, the ALJ concluded that Plaintiff was not under a disability from October 31, 2013 (the alleged onset date) through September 30, 2019 (the date last insured).  (R. at 6398.)

## IV.     ANALYSIS

### A.  The ALJ Erred in Evaluating Dr. Creekmore's Opinions

Plaintiff argues that the ALJ failed to apply correct legal standards in analyzing Dr. Creekmore's opinions and that substantial evidence does not support the ALJ's justifications for assigning Dr. Creekmore's opinions "limited weight."  (Pl.'s Mem. at 12.)  The Commissioner contends otherwise.  (Def.'s Mem. at 12.)  As discussed below, the Court agrees with Plaintiff.

#### 1.  Applicable Standard for Evaluating Medical Opinion Evidence

Claims involving medical opinion evidence filed before March 27, 2017 are evaluated under the framework found in 20 C.F.R. § 404.1527.[5]   Under this regulation, the ALJ must consider all medical opinions in the record.  20 C.F.R. § 404.1527(c).  However, treating providers are "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence" that cannot otherwise be procured. *Id.*  Therefore, the ALJ must give "controlling weight" to the medical opinion of a treating source on the nature and severity of the impairments if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" in the record.  *Id.*; *Arakas v. Comm., Soc. Sec. Admin.*, 983 F.3d 83, 106-07 (4th Cir.

---

[5] Claims involving medical opinion evidence filed on or after March 27, 2017 are evaluated using a revised regulatory framework.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844-01 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

2020); *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017); *Craig*, 76 F.3d at 590.  The Fourth

Circuit has emphasized that this treating provider rule "is a robust one: '[T]he opinion of a

claimant's treating [provider] [must] be given great weight and may be disregarded only if there

is persuasive contradictory evidence.'" *Arakas*, 983 F.3d at 107 (quoting *Coffman v. Bowen*, 829

F.2d 514, 517 (4th Cir. 1987)) (first and third alteration in original).

      If an ALJ decides not to give the treating provider's opinion controlling weight under this

rule, he or she must consider the following factors to determine its appropriate weight: (1) the

length of the treatment relationship and the frequency of examination; (2) the nature and extent of

the treatment relationship; (3) supportability based upon the medical record; (4) consistency

between the opinion and the medical record; (5) any specialization on the part of the treating

source; and, (6) any other relevant factors that the ALJ is aware of that tend to support or contradict

the medical opinion.  20 C.F.R. § 404.1527(c)(1)-(6).  While the ALJ is not required to discuss

each factor in the decision, it must be "apparent from the ALJ's decision that he [or she]

meaningfully considered each of the factors before deciding how much weight to give the

opinion," and the ALJ "'must include a narrative discussion describing how the evidence supports

his [or her] explanation of the varying degrees of weight he [or she] gave to differing opinions

concerning the claimant's conditions and limitations.'" *Pace v. Kijakazi*, No. 20-2337, 2022 WL

3334628, at *1 (4th Cir. Aug. 12, 2022) (unpublished) (citing *Dowling v. Comm'r of Soc. Sec.

Admin*, 986 F.3d 377, 385 (4th Cir. 2021) and *Woods v. Berryhill*, 888 F.3d 686, 695 (4th Cir.

2018)).

      *2. Dr. Creekmore's Opinions*

      In 2018, Dr. Creekmore completed a Mental Status Evaluation Form.  (R. at 6211-15.)  She

reported seeing Plaintiff since October 30, 2017 and visiting with her two to three times per week.

(R. at 6211.)   Dr. Creekmore diagnosed Plaintiff with DID, panic disorder, MDD, somatic

symptom disorder, and PTSD.  (R. at 6211.)  She listed Plaintiff's symptoms as including severe pain, severe sleep problems, extreme fatigue, withdrawal, anxiety, depressed mood, blunted affect, suicidal ideations, and impaired memory, attention, and judgment.  (R. at 6211-14.)  Dr. Creekmore opined that Plaintiff could not function independently except for brief daily periods during which Plaintiff may be able to accomplish one activity (i.e. preparing a boxed food).  (R. at 6212.)  Dr. Creekmore noted that Plaintiff's husband and family compensated for her minimal activities by carrying out most household tasks.  (R. at 6212.)  Dr. Creekmore stated that Plaintiff could not work in any capacity.  (R. at 6214.)

In 2019, Dr. Creekmore provided a nineteen-page sworn statement supporting Plaintiff's diagnoses and detailing Plaintiff's mental conditions and symptoms.  (R. at 6324-42.)  Dr. Creekmore described Plaintiff as having the following symptoms associated with her conditions:

- Depression: diminished interest in activities, appetite disturbance, sleep disturbance, feelings of guilt or worthlessness, difficulty concentrating or thinking, blunted affect, sleeping 15 hours a day, fatigue, lack of energy, negative thoughts of life, and passive thoughts of death.  (R. at 6327-30.)
- Anxiety: restlessness, fatigue, trouble sleeping, difficulty concentrating and thinking, irritability, and muscle tension.  (R. at 6331.)
- Somatic symptom disorder: hand pain.  (R. at 6331.)
- DID: detachment from social relationships, feelings of inadequacy, lack of stamina, feelings of emptiness, "switching" between alters, "idolizing versus evaluating people[,]" and irritability.  (R. at 6334-35.)
- PTSD: sleep disturbance and vigilance.  (R. at 6335.)

While Plaintiff self-reported many of symptoms, Dr. Creekmore stated she never viewed Plaintiff as lying or exaggerating.  (R. at 6329.)  In addition, Dr. Creekmore observed Plaintiff as appearing depressed and unkempt, exhibiting a lack of energy and hypervigilance, and having a blunted affect.  (R. at 6330, 6331, 6337.)

Dr. Creekmore did not conduct mental status examinations on Plaintiff.  (R. at 6330.)  She explained that such examinations only describe a patient's status in a given instant, not whether he or she is capable of working every day:

> [Y]ou'd be more than lucky to catch [Plaintiff] at the precise moment where she's not oriented times three or so stressed out that she can't count backwards from 100 by sevens.  That is probably even more the case if she's in the safety and security of my office or any doctor's office.  It's not the same as being out there in the world—like work.

(R. at 6330-31.)

Dr. Creekmore saw Plaintiff two to three times a week since October 2017, and appointments included weekly pain management hypnosis and therapy sessions.  (R. at 6332-33, 6336.)  According to Dr. Creekmore, the high number of weekly visits is more frequent than many of her patients and reflects the severity of Plaintiff's mental impairments.  (R. at 6334.)

Dr. Creekmore opined that Plaintiff could not care for herself, much less others, because of "all the symptoms she experiences on a day to day basis," and that she relies on her husband and parents to manage the household and care for both her and the children.  (R. at 6333-34, 6338.)  Dr. Creekmore stated that "there is, almost by definition, an excessive need to be taken care of" as Plaintiff was not working and had no homemaker responsibilities.  (R. at 6334.)  Dr. Creekmore explained:

> [Plaintiff] has very limited activities as it stands right now and it's been that way since I began seeing her.  Between her major depression, her fatigue and her anxiety she doesn't even do basic stuff.  If she was required to do things she's not doing now; for example, she may not bathe for three weeks.  She would have to bathe to be able to go to work.  And that seems to be too much—just bathing on a regular basis.

(R. at 6337.)   Dr. Creekmore reported that Plaintiff was regularly late to appointments and "unkempt."  (R. at 6337-38.)  Although Plaintiff's daughter was homeschooled, Dr. Creekmore stated that Plaintiff would "go three weeks and do nothing with the child on homeschooling."  (R.

at 6337.)  Dr. Creekmore acknowledged that Plaintiff attended Alcoholics Anonymous meetings, which she described as a "safe" environment for Plaintiff, and sometimes taxied her daughter to meet ups with other homeschooled children.  (R. at 6339.)  Dr. Creekmore opined that she has "no doubt that if [Plaintiff] was working at anything – no matter how simple or easy – she [would not] survive."  (R. at 6340.)

On June 8, 2022, Dr. Creekmore prepared a separate statement for the record.  (R. at 6632-33.)  Against Dr. Creekmore's advice, Plaintiff had begun working part-time.  (R. at 6632.)  Dr. Creekmore stated that Plaintiff quickly experienced an "immediate increase in panic attacks, low moods, dissociations and the return of her hand pain . . . ."  (R. at 6632.)  Initially, Plaintiff's employment accommodated her unscheduled absences, but a change in management and more "stringent requirement for her attendance" resulted in her departure from that position.  (R. at 6632.)  Dr. Creekmore reported that Plaintiff "turn[ed] to anti-anxiety agents in the setting of her addictive personality."  (R. at 6632.)  Her "increased medications seemed to allow her to get another part-time job," which resulted in stress followed by a reduction in shifts.  (R. at 6633.)  In April 2020, Plaintiff stopped seeing Dr. Creekmore.  (R. at 6633.)

### 3.  *The ALJ's Evaluation of Dr. Creekmore's Opinions Did Not Comply With Applicable Law and Lacks Substantial Evidentiary Support*

After acknowledging the three-year treating relationship and summarizing Dr. Creekmore's opinions, the ALJ assigned these opinions "limited weight."  (R. at 6395-96.)  The ALJ provided the following reasons to support this level of weight: (1) the severity of functional limitations are not reflected elsewhere in the record, and Plaintiff's mental status examinations were largely normal; (2) Plaintiff received conservative, routine, and outpatient treatment with no evidence of psychiatric hospitalization; (3) even during periods of symptom exacerbation, Plaintiff

retained at least some capacity to perform tasks; and (4) Plaintiff successfully returned to full-time work in 2021.  (R. at 6396.)[6]

By regulation, Dr. Creekmore's treating source opinions should be given controlling weight unless they are not well-supported or are inconsistent with other substantial record evidence.  20 C.F.R. § 404.1527(c)(2).  Here, the ALJ never stated why she determined that Dr. Creekmore's opinions did not qualify for controlling weight and instead immediately assigned them limited weight.  While it appears that the ALJ found Dr. Creekmore's opinions inconsistent with the record evidence, the ALJ never adequately explains the basis for that conclusion.  In addition, it is not "apparent from the ALJ's decision that [s]he meaningfully considered *each* of the [Section 404.1527(c)] factors before deciding how much weight to give the opinion[s]."  *Dowling*, 986 F.3d at 385.  Under the regulations, the ALJ must consider (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source;[7] and (6) any other relevant factors of which the ALJ is aware.  20 C.F.R. § 404.1527(c)(1)-(6).  Of those factors, the ALJ focused almost entirely on consistency in discrediting Dr. Creekmore's opinions.  But in

---

[6] The ALJ also found that Dr. Creekmore's conclusions regarding employment touched on issues reserved for the Commissioner.  (R. at 6396.)  While some opinions do not qualify as medical opinions because they concern topics reserved for the Commissioner, such as whether a claimant is disabled or unable to work, an ALJ may not discount the entirety of a provider's statement simply because it touches on issues reserved for the Commissioner.  *Shelley C.*, 61 F.4th at 356; see *also* 20 C.F.R. § 404.1527(d).

[7] Plaintiff contends that the ALJ's reference to *Dr.* Creekmore as *Ms.* Creekmore should be viewed as significant evidence of the ALJ's "indifference to both the facts and law."  (Pl.'s Mem. at 12 n.5.)  While the ALJ regularly and incorrectly referred to Dr. Creekmore as Ms. Creekmore, the Court views those references as clerical errors.  Elsewhere in the decision, the ALJ acknowledged Plaintiff received treatment with "licensed clinical psychologist Anne Creekmore Psy.D." and correctly referred to her as "Dr. Creekmore."  (R. at 6389, 6393.)

doing so, the ALJ failed to articulate the sufficient reasons for her conclusions.  *Arakas*, 983 F.3d at 110 (quoting *Monroe v. Colvin*, 826 F.3d 176, 190 (4th Cir. 2016)) ("ALJs must provide a narrative discussion of how specific evidence supports the 'varying degrees of weight' assigned to different opinions.").

Considering the record as a whole, and as explained below, the ALJ's sparse justifications fail to provide a sufficient narrative discussion as to why Dr. Creekmore's opinions as the treating psychologist did not warrant controlling weight.  Further, the ALJ failed to provide a sufficient narrative as to how she arrived at the "limited" weight assignment instead.  These errors require remand.

a.  The ALJ Failed to Identify Persuasive Contradictory Record Evidence

In justifying the limited weight assignment, the ALJ first stated that Dr. Creekmore's opinions as to Plaintiff's "functional limitations are just not reflected at any point by any other treating provider in the nearly 10 years and 6000 pages of records available."  (R. at 6396.)  But she failed to describe those inconsistent records or identify them by citation.  To the extent the ALJ cited mostly "normal" mental status examinations as inconsistent, Dr. Creekmore specifically explained why such examinations were not helpful to assess the functional limitations caused by mental impairments like Plaintiff's.  (R. at 6330-31, 6396.)  According to Dr. Creekmore, normal mental status examinations were *not* inconsistent with her opined functional limitations.  (R. at 6330-31.)  Considering Dr. Creekmore's explanation of what mental status examinations show and the ALJ's silence on this point, these examinations alone do not constitute substantial, inconsistent evidence.

The ALJ also previously cited portions of the record consistent with Dr. Creekmore's opinions, including Plaintiff's hearing testimony.  Thus, not only did the ALJ fail to identify what

evidence among the 6,000 pages is inconsistent with Dr. Creekmore's opinions, but she also failed to explain why she discounted evidence consistent with Dr. Creekmore's opinions.[8]  "Because the ALJ failed to point to specific objective evidence showing that [Dr. Creekmore's] opinion was 'inconsistent' with the record's other medical evidence, [her] analysis, or lack thereof, has 'frustrate[d]' this reviewing court's 'meaningful review.'"  *Shelley C.*, 61 F.4th at 358 (quoting *Mascio*, 780 F.3d at 636).[9]

      b.  <u>The Treatment Received by Plaintiff Does Not Contradict Dr. Creekmore's Opinions</u>

Next, the ALJ labeled Plaintiff's treatment as conservative, routine, and outpatient and thus inconsistent with the level of functional limitations found by Dr. Creekmore.  Dr. Creekmore, however, did not characterize Plaintiff's treatment as conservative or routine.  Plaintiff's treatment consisted of weekly therapy sessions and hypnosis, with visits two to three times a week.  (R. at 70-71, 6332-33, 6336.)  In addition, Plaintiff took medications "most of the time from 2013 to 2020" with regular medication adjustments.  (R. at 6429.)  Regarding treatment, Plaintiff explained:

> I've gone to every doctor I could since this has happened and I have requested test after test and surgery after surgery and when they all say we're not going to help you, go to psych, I started going to psych.  And I went to psych three times a week

---

[8] The Appeal Council's remand order makes this gap in explanation even more pronounced.  The remand order states that the ALJ "must provide good reasons for the w[e]ight afforded to a claimant's treating sources."  (R. at 6477.)  It points out that the ALJ's prior decision failed to do so because it did "not discuss other evidence of record that appears to support Dr. Creekmore's opinion," including Plaintiff's regular tardiness to appointments, Plaintiff's inability to actively and regularly engage in homeschooling activities with her daughter, and the extent of household and care responsibilities handled by Plaintiff's parents and husband.  (R. at 6477-78.)  The ALJ's decision on remand still fails to explain how she considered that evidence or why it undermines rather than supports Dr. Creekmore's opinions.

[9] Plaintiff also argues that the ALJ applied an incorrect legal standard in relying on the absence of objective medical evidence to discredit Dr. Creekmore's opinions.  (Pl.'s Mem. at 14-15.)  Because the Court finds that the ALJ erred on other grounds warranting remand, the Court need not reach the merits of that argument.

for, I don't know, six, nine months and it go[t] so overwhelming.  So we're down to two times a week and I will do anything I can to get through this.

(R. at 70.)

Dr. Creekmore stated that this level of treatment supported the severity of Plaintiff's conditions because most patients do not require that much attention.  (R. at 6334.)  While the ALJ highlighted the lack of any hospitalization stemming from Plaintiff's mental conditions, Dr. Creekmore explained that Plaintiff did not require more extreme levels of treatment because she lived with her parents and husband and was therefore "taken care of."  (R. at 6334.)  Given this record, the ALJ failed to provide adequate support for her conclusion that Plaintiff's treatment level undermines Dr. Creekmore's opinions.

c.   <u>Plaintiff's Limited Capacity to Perform Tasks Does Not Contradict Dr. Creekmore's Opinions</u>

The ALJ also pointed to Plaintiff's daily activities as justification for assigning limited weight to Dr. Creekmore's opinions.  According to the ALJ, even during periods of symptom exacerbation, Plaintiff "retained at least some capacity to care for personal needs, prepare simple meals, assist with household chores, drive, shop for personal items, manage the household finances, home school a seven year old child, and work on at least a part-time basis . . . ."  (R. at 6396.)  Dr. Creekmore, on the other hand, opined that Plaintiff could not function independently except for brief daily periods during which Plaintiff might be able to accomplish one activity.  (R. at 6212.)  She stated Plaintiff struggled to accomplish basic tasks, like bathing on a regular basis. (R. at 6337.)  Dr. Creekmore also explained that Plaintiff could go weeks without engaging in homeschooling activities with her daughter.  (R. at 6337.)

Similarly, over the course of the three hearings, Plaintiff testified that she could not bathe or brush her teeth regularly and often did not get dressed for the day.  (R. at 119.)  Plaintiff testified

to feeling unable to handle her anxiety and going through cycles of depression that left her bedridden.  (R. at 6423-24.)  Plaintiff lacked "motivation to do anything" and avoided social situations.  (R. at 119.)  Instead, she would "just kind of hide in bed, literally."  (R. at 119.)  Plaintiff testified to having two to three days a week where she could not get out of bed to accomplish daily tasks of living.  (R. at 6390.)

Regarding her child-rearing responsibilities, she testified that from 2014 and during her treatment with Dr. Creekmore, she "was basically available to save [the children] if there was a fire" but otherwise was not involved in their care.  (R. at 6424.)  She did not pick up her younger son during his infant or toddler years, could not "handle the stress of going anywhere with [her] children," and did not prepare their meals or snacks unless the preparation involved nothing more than adding water or toasting.  (R. at 6424.)  On days Plaintiff could not get out of bed, her daughter would make breakfast.  (R. at 53.)  Plaintiff testified that when she was responsible for taking her son to the bus stop for school, he would miss the bus once a week or once every two weeks and he would often miss school entirely.  (R. at 53.)  On the days Plaintiff was able to get her son on the bus, she would go back to bed, and her daughter would "play quietly, [and] do her own thing around the house."  (R. at 53.)

Plaintiff testified to homeschooling her daughter but admitted they lacked a routine.  (R. at 54.)  Plaintiff's homeschooling responsibilities consisted of driving her daughter to a few activities each week, finding videos for her daughter to watch, and quizzing her daughter when Plaintiff felt able to do so.  (R. at 54-55.)  Plaintiff estimated those responsibilities took about one to three hours per week.  (R. at 63-64.)  When Plaintiff did not "feel good" or experienced a cycle of depression, she failed to do anything with her daughter in terms of homeschooling.  (R. at 54-55, 6423-24.)  Plaintiff explained: "I had a lot of days where I couldn't force myself to do it.  I couldn't motivate

20

myself.  I couldn't get out of bed somedays.  I couldn't deal with the stress of trying to get a child to do what she needed to do."  (R. at 6422.)

Considering this record evidence, substantial evidence does not support the ALJ's conclusion that Plaintiff's stated activities contradict Dr. Creekmore's opinions.  To the extent Plaintiff could perform certain tasks, the ALJ failed to "acknowledge the limited extent of those activities as described by [the claimant]" and failed to explain how those limited activities contradict Dr. Creekmore's opinions or otherwise "showed that [the claimant] could persist through an eight-hour workday."  *Brown v. Commissioner of Social Security Administration*, 873 F.3d 251, 263, 269-71 (4th Cir. 2017).[10]

### d. Plaintiff's Return to Full-Time Work in 2021 Does Not Contradict Dr. Creekmore's Opinions as to Plaintiff's Functional Limitations During Earlier Periods

Finally, the ALJ determined that Plaintiff's successful return to full-time work in 2021 undercuts Dr. Creekmore's opinions.  (*See* R. at 6394.)  Yet, the ALJ failed to articulate how this return to work supports a finding of no disability for the period at issue—from 2013 to 2019. While the ALJ found no evidence suggesting that Plaintiff could not have returned to work earlier, this again does not articulate reasons for rejecting Dr. Creekmore's opinions or other record evidence consistent with those opinions, such as Plaintiff's testimony.  The ALJ acknowledged that Plaintiff stopped treatment with Dr. Creekmore in 2020 and stopped medication in 2021.  (R.

---

[10] Notably, the Appeals Council's remand order instructed the ALJ to address these very issues. Although the prior decision referenced daily activities, the remand order highlighted Plaintiff's testimony that she could not bathe regularly, did not brush her teeth every day, did not get out of her pajamas, spent days in bed, and could not care for or homeschool her children with regularity. (R. at 6478.)  The Appeals Council noted that Plaintiff's "activities appear to be far more transient than characterized within the hearing decision, and the [ALJ] does not fully explain how such activities demonstrated an ability to work for 8 hours per day, 5 days per week.  Further consideration is warranted."  (R. at 6478.)  Here, the ALJ repeated the same error.

at 6389-90, 6396.)  Plaintiff further testified that she could only return to work in 2021 because her lengthy treatment with Dr. Creekmore gave her the tools needed to manage her symptoms.  (R. at 6426 ("I think the treatment that [Dr.] Creekmore did is the only reason I'm able to function.  I feel like she kind of helped me get my life back.").)  Plaintiff further testified that she had not fully mastered those tools when she first attempted to return to part-time work in earlier years.  (R. at 6426.)  Her part-time work triggered and exacerbated her symptoms, resulting in work adjustments that allowed her to "sit in the office and cry[.]"  (R. at 6426.)  The ALJ again failed to articulate why Plaintiff's return to work in 2021, after she completed treatment with Dr. Creekmore and managed to stop medication, impacts the disability decision for the time period 2013 to the 2019 date last insured.

In sum, the ALJ did not adequately explain the reasoning behind her decision not to assign controlling weight to Dr. Creekmore's opinions and to instead give them only limited weight.  This lack of explanation frustrates the Court's ability to conduct a meaningful review of the ALJ's conclusion and justifies remand.  *See Arakas*, 983 F.3d at 106 (stating that a "cursory explanation [falls] short of [the ALJ's] obligation to provide a narrative discussion of how the evidence supported his conclusion and as such, the analysis is incomplete and precludes meaningful review"); *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 662 (4th Cir. 2017) (remanding and noting that "because we cannot gauge the propriety of the ALJ's . . . assessment, we cannot say that substantial evidence supports the ALJ's denial of benefits").

### B.  The ALJ Erred in Evaluating Plaintiff's Subjective Complaints

Plaintiff next argues that the ALJ acted contrary to *Shelley C.* by requiring objective support for Plaintiff's symptoms.  (Pl.'s Mem. at 22; *see* Plaintiff's Reply to Defendant's Motion for Summary Judgment ("Pl.'s Reply") (ECF No. 13) at 6.)  Plaintiff contends that the other

reasons given for discounting her subjective complaints mirror those offered to discredit Dr. Creekmore's opinions and fail for the same reasons.  (Pl.'s Mem. at 22-24.)  The Commissioner argues otherwise and asserts that the ALJ "did not solely rely on objective evidence but, in accordance with *Shelley C.*, considered the entire record, including Plaintiff's daily activities." (Def.'s Mem. at 17.)  The Court agrees with Plaintiff.  The ALJ erred by discounting Plaintiff's subjective complaints based on a lack of objective evidence, in direct violation of *Shelley C.*  The other reasons offered by the ALJ also fail because they are unsupported by the record's substantial evidence.

### 1.  *Standard for Evaluating Subjective Complaints*

The regulations provide for a two-step process in evaluating Plaintiff's subjective complaints of symptoms in the disability determination.  20 C.F.R.  § 404.1529; *see also* SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017).  First, the ALJ must determine "whether objective medical evidence presents a 'medically determinable impairment' that could reasonably be expected to produce the claimant's alleged symptoms."  *Arakas*, 983 F.3d at 95 (citing 20 C.F.R. § 404.1529(b); SSR 16-3p).  Second, "after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled."  *Id.*  The claimant does not need to produce objective evidence to satisfy this second prong.  *Id.*  Indeed, the Fourth Circuit has found that claimants are allowed to rely entirely on subjective evidence of symptoms to demonstrate that it was sufficiently persistent and severe.  *See Arakas*, 983 F.3d at 96; *see also Shelley C.*, 61 F.4th at 360-61.  The Fourth Circuit explained that by discrediting a plaintiff's complaints based on the lack of objective medical evidence corroborating them, an ALJ improperly increases the plaintiff's burden of proof.  *Arakas*, 983 F.3d at 96.

2. *The ALJ Erred in Discounting Plaintiff's Subjective Complaints as Inconsistent with the Record's Medical Evidence*

The ALJ provided the following rationale in discrediting Plaintiff's subjective complaints. First, she found that the conservative, routine, and outpatient nature of Plaintiff's mental health treatment did not support the level of functional limitations claimed by Plaintiff. (R. at 6393.) Second, the ALJ pointed to Plaintiff's grossly normal mental status evaluations and further found "no objective support for the testified recurrence of symptom flares that have left her bedridden 2-3 days per week." (R. at 6393.) Third, the ALJ found that Plaintiff's activities of daily living did not support the extent of symptoms claimed by Plaintiff. For example, the ALJ noted that Plaintiff and her husband indicated that Plaintiff cared for their two children in 2014. (R. at 6393.) Plaintiff also "reported a capacity to care for some personal hygiene needs, prepare simple meals, put toys away, assist with laundry, drive, shop for personal items, handle her finances, read, watch movies, attend support groups, and maintain medical appointments." (R. at 6393-94.) Even when experiencing increased symptoms, Plaintiff "retained some capacity to provide a home school environment for her oldest daughter and work on at least a part time basis during the period at issue." (R. at 6394.) Fourth, the ALJ relied on Plaintiff's return to full time work in 2021 and the lack of evidence suggesting that she could not have returned to that employment earlier as belying Plaintiff's subjective complaints. (R. at 6394.)

As an initial matter, the ALJ failed to comply with *Shelley C.* by requiring "objective support" for Plaintiff's testimony that her conditions rendered her bedridden two to three days a week. In *Shelley C.*, the Fourth Circuit held that the ALJ could not dismiss Plaintiff's subjective complaints of MDD "based *entirely* upon the belief that they were not corroborated by the record's medical evidence." 61 F.4th at 360 (emphasis in original). Because symptoms of MDD are "entirely subjective" and "can vary from person to person," the Fourth Circuit acknowledged that

24

the absence of medical evidence documenting the "intensity, severity, degree or functional effect of [such symptoms] is not determinative." *Id.* at 360-61 (citations omitted).   Thus, "subjective statements from claimants [regarding MDD] 'should be treated as evidence *substantiating* the claimant's impairment.'"   *Id.* at 361-62 (citing *Arakas*, 983 F.3d at 97-98).   Here, the ALJ "'improperly increased [Plaintiff's] burden of proof,' . . . in requiring that her subjective statements be validated by objective medical support . . . ."   *Id.* at 362 (citing *Arakas*, 983 F.3d at 96).

The other reasons offered by the ALJ to discredit Plaintiff's subjective complaints mirror those given by the ALJ in assigning limited weight to Dr. Creekmore's opinions.   They lack substantial support in the record and fail for similar reasons previously addressed.   *See supra* Part IV.A.3.

### C.  Remand for Further Proceedings, Rather Than an Award of Benefits, Is the Appropriate Remedy

Plaintiff contends this case warrants a direct award of benefits as the case's "evidence [is] so compelling that no further remand for assessment [is] necessary."  (Pl.'s Mem. at 20-21; *see also* Pl.'s Mem. at 24.)  The Court declines to direct the award of benefits and instead recommends that this matter be reversed and remanded for further administrative proceedings.

Section 405(g) of the Act authorizes the Court to reverse the administrative decision, "with or without remanding the cause of rehearing."  42 U.S.C. § 405(g).  Where, as here, the Court "has no way of evaluating the basis for the ALJ's decision, then the proper course, *except in rare circumstances*, is to remand to the agency for additional investigation or explanation."  *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (emphasis added).  On the other hand, reversal with a direct award of benefits would be appropriate "*[o]nly* in the unusual case" where it is "clear on review, despite the absence of an explanation from the ALJ, that the record does *not* contain substantial evidence that could support" a denial of benefits.  *Carr v. Kijakazi*, No. 20-2226, 2022

WL 301540, at *3-4 (4th Cir. Feb. 1, 2022) (first emphasis added) (unpublished).  In other words, reversal without remanding for further proceedings would be appropriate only "where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden*, 493 F.2d at 1012 (4th Cir. 1974).

While the Court has determined that the ALJ erred in evaluating Dr. Creekmore's opinions and Plaintiff's subjective complaints, Plaintiff's disability and entitlement to benefits is not clearly established.  Therefore, remand for further evaluation, rather than a direct award of benefits, is the appropriate remedy.

## V.    CONCLUSION

For the reasons set forth above, the Court RECOMMENDS that: (1) Plaintiff's Motion for Summary Judgment (ECF No. 9) be GRANTED; (2) the Commissioner's Motion for Summary Judgment (ECF No. 11) be DENIED; (3) the final decision of the Commissioner be REVERSED; (4) the case be REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Report and Recommendation; and (5) final judgment be entered under Rule 58 of the Federal Rules of Civil Procedure.

Let the clerk forward a copy of this Report and Recommendation to the Honorable United States District Judge Roderick C. Young and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar**

26

you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

_____ /s/

Summer L. Speight
United States Magistrate Judge

Richmond, Virginia
Date: August 8, 2024

27